FARMERS' LOAN & TRUST CO. v. NORTHERN PAC. R. CO. et al.

(Circuit Court, E. D. Wisconsin. June 17, 1895.)

RAILROAD COMPANIES—RECEIVERS—PREFERRED CLAIMS—DIVERSION OF FUNDS.

A judgment was recovered against a railroad company, which gave bond and appealed. Pending appeal, the road went into the hands of receivers appointed in an action by the trustee for bondholders to foreclose a mortgage executed prior to the recovery of the judgment. The judgment was affirmed, and the receivers petitioned for leave to pay it out of the funds accruing from the operation of the road since the receivership, on the ground that the owner of the judgment was about to sue the sureties on the appeal bond, who had become bound solely for the accommodation of the company, and that, by virtue of such bond, the assets of the road had been preserved and increased by the amount of the judgment. *Held*, that the claim of the sureties could not be thus given preference over the mortgage bonds, as the lien of the latter was superior to that of the judgment, and there had been no diversion of funds to the benefit of the bondholders so as to create an equity to a preference. Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. R. Co., 53 Fed. 182, disapproved.

In Equity. Bill by the Farmers' Loan & Trust Company against the Northern Pacific Railroad Company and others to foreclose a mortgage, and for the appointment of receivers. The receivers petitioned for leave to pay a judgment rendered against the road prior to their appointment.

Sullivan & Cromwell and Miller, Noyes, Miller & Wahl, for receivers.

Turner, McClure & Rolston, for complainant.

Michael H. Cardozo, for Johnston Livingston.

JENKINS, Circuit Judge. In October, 1887, one O'Brien recovered a judgment against the Northern Pacific Railroad Company in the district court for the Fourth judicial district of the then territory (now state) of Washington, sitting in and for the county of Yakima, for the sum of $6,000, and costs. The company sued out a writ of error in the supreme court of the territory to review such judgment, and thereupon executed a supersedeas bond with sure-

ties.  The judgment was on the 7th day of March, 1889, affirmed by the supreme court of the territory.  Thereupon the defendant company caused a writ of error to be issued out of the supreme court of the United States to review the judgment of the supreme court of Washington Territory, and another supersedeas bond was thereupon given with certain other persons as sureties.  This last writ of error was dismissed in November, 1894.  Railroad Co. v. O'Brien, 155 U. S. 141, 15 Sup. Ct. 30.  The receivers of the railroad company, who were appointed by this court in August, 1893, now petition the court, upon the facts above stated, and upon the further assertion of fact that the owner of the judgment is about to institute suit against the sureties upon the supersedeas bonds to recover the amount due upon the judgment, for authority to pay the judgment out of funds in their hands accruing from the operation of the road since the receivership.  The receivers advise the court that the sureties became bound solely as matter of accommodation and convenience to the company, and without pecuniary advantage of any kind to themselves.  They also assert that, by virtue of the supersedeas bonds, "the assets of the Northern Pacific Railroad Company which came into the hands of your petitioners as receivers have been preserved, and were increased by the amount of such judgment which would have been collected out of the assets of said company if said supersedeas bonds had not been given."  The trust company, complainant, which is the trustee under all of the mortgages here sought to be foreclosed, answers to the petition that in view of the fact that, if the judgment had been paid before writ of error sued out and supersedeas bonds given, the assets of the company coming into the hands of the receivers would have been decreased in amount, and in view of the peculiar hardships of the case, it consents to the granting of the prayer of the petition.  The representative of the second mortgage bondholders, who has been made a party to the suit, opposes the granting of the petition, and denies the right of the court by such order to diminish the fund from which their mortgage should be paid.

I had occasion in the case of Farmers' Loan & Trust Co. v. Green Bay, W. & St. P. Ry. Co., 45 Fed. 664, to discuss the principle which underlies the allowance of preferential claims in the case of railroad foreclosures, and found it to be bottomed upon the idea of diversion of funds in equity belonging to the general creditors in preference to bondholders.  I there said:

"The gross income arising from the operation of a railway should be first applied to the payment of the expenses of operation, proper equipment, and needful improvements. · If the income be diverted to the payment of bonded interest in disregard of the payment of such expenses, there should be restoration to original equitable right.  Failing diversion, there can be no restoration.  The amount of restoration is dependent upon the amount of diversion."

I also there said that in case of failure by the trustee to take possession upon default, as the road must be kept a going concern, equity would recognize as preferential the expense of operation after default and within a limited time prior to the receivership, because

the expense of operation was indispensable to the preservation of the property. The latter ground is founded sometimes upon an implied assent by the bondholders growing out of their failure to take possession; sometimes upon the ground of laches; sometimes upon the ground of estoppel. In view of the hardship which will result to the sureties if they should be compelled to pay the judgment in question, I have taken occasion to reconsider the subject of preferential claims. A careful review of the whole question leaves no doubt in my mind of the correctness of my former holding.

The rule was stated by Chief Justice Waite in Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, as follows:

"That, if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has thus been improperly applied to their use."

In St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. Ry. Co., 125 U. S. 659, 674, 8 Sup. Ct. 1011, the court again declares the rule, and observes:

"There has been no departure from this rule in any of the cases cited. It has been adhered to and reaffirmed in them all."

In the case of Kneeland v. Trust Co., 136 U. S. 89, 97, 10 Sup. Ct. 950, the supreme court had occasion again to consider the subject, and observes as follows:

"The appointment of a receiver vests in the court no absolute control over the property and no general authority to displace vested contract liens. Because in a few specified and limited cases this court has declared that unsecured claims were entitled to priority over mortgage debts, an idea seems to have obtained that a court appointing a receiver acquires power to give such preference to any general and unsecured claims. It has been assumed that a court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness. Indeed, we are advised that some courts have made the appointment of a receiver conditional upon the payment of all unsecured indebtedness in preference to the mortgage liens sought to be enforced. Can anything be conceived which more thoroughly destroys the sacredness of contract obligations? One holding a mortgage debt upon a railroad has the same right to demand and expect of the court respect for his vested and contracted priority as the holder of a mortgage on a farm or lot. So, when the court appoints a receiver of railroad property, it has no right to make that receivership conditional on the payment of other than those few unsecured claims which, by the rulings of this court, have been declared to have an equitable priority. No one is bound to sell to a railroad company, or to work for it, and whoever has dealings with a company whose property is mortgaged must be assumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subsequently displacing the priority of the mortgage liens. It is the exception, and not the rule, that such priority of liens can be displaced. We emphasize this fact of the sacredness of contract liens for the reason that there seems to be growing an idea that the chancellor, in the exercise of its equitable powers, has unlimited discretion in this matter of the displacement of vested liens."

See, also, Penn v. Calhoun, 121 U. S. 251, 7 Sup. Ct. 906.

The law is established upon the authority of the ultimate tribunal, notwithstanding the contrary opinion held by some subordinate courts, that general creditors of a railroad company cannot with respect to the income of the road after receivership be allowed pri-

ority to the mortgage where there has been no diversion of funds to the benefit of the mortgage interest, working injury to the general creditor, or where the mortgage bondholders have not unduly delayed the assertion of their rights after default, and have not lain by and permitted an indebtedness to accrue for the operating expenses of the road when possession should have been taken by the trustee, and with which expenses they should therefore be chargeable. A court of equity has not the prerogative to thus displace the lien of a mortgage, or to charge the general indebtedness upon the corpus of the estate in priority to the mortgage lien.

Within the rule thus declared, has any equity been shown which would authorize the granting of relief to these sureties? At the date of the judgment there were outstanding mortgages upon the entire or parts of the main line of railway securing bonds now outstanding to the enormous amount of $76,429,000. The sureties dealt with the company with knowledge of this fact, and were chargeable with knowledge of it. They voluntarily assumed the obligation, relying upon the company to protect and indemnify them. They required no security for their assumption of liability. Upon what ground, then, can it be claimed that they should now be allowed priority, not only over general creditors of the company, but that vested mortgage rights existing when they signed these bonds should be subordinated to the payment of the debt which they assumed? It is said that the assets which came into the hands of the receivers have been thereby preserved, and were increased by the amount of the judgment which would have been collected out of the assets of the company if the supersedeas bond had not been given. Does this furnish sufficient reason to postpone the lien of the mortgages to the payment of this debt? The judgment which was stayed was a lien subordinate to that of the mortgages, and could only have been enforced subject to them. It might possibly have been collected out of the current income of the road; but that fact, I think, could not avail to displace the priority of recorded liens without a showing that by reason of nonpayment, property not subject to the mortgages had come to the possession of the receivers, and had been appropriated to the benefit of the bondholders. Possibly, such property might be followed; but in such case could the sureties be preferred to the other general creditors? The argument would give priority to every general creditor of the road, and would render substantially worthless every mortgage lien. This railroad company is bankrupt, with an enormous bonded debt and an immense floating unsecured debt. There is here no claim of diversion of funds. The proposition, stripped of its verbiage, amounts simply to this: That general creditors of the railroad company are in law and in equity to be preferred to mortgage creditors. I am not aware of any decision going quite so far, although it must be confessed that the case of Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. R. Co., 53 Fed. 182, is a dangerous approximation to such holding. I think that case to be in direct antagonism to the rulings of the supreme court, and I am not able to follow it. The argument that, in analogy to the

principle of the maritime law, a 'mortgage of a railroad should be subordinated to claims for repairs and supplies, is plausible, but, in my judgment, quite fallacious. It is made in misconception of the underlying principle of the admiralty that repairs and supplies are awarded priority when, and only when, they are furnished in a foreign port, solely upon the credit of the vessel, and when, and only when, they are absolutely necessary to enable the ship to finish her voyage, and thus to preserve the security of the mortgage. The principle is grounded upon necessity. The ship in the course of her voyage has arrived at a foreign port in distress, and is unable to pursue the voyage or return to her home port. The owner is presumed to be unknown, and to be without credit at the foreign port. Unless the master can obtain the needed repairs and supplies, and pledge the credit of the vessel therefor, the ship will rot at the wharf, and the mortgage security be put in jeopardy. Therefore it is that from the very necessity of the case the master is authorized to pledge the credit on the vessel for necessary repairs and supplies. If, however, the supplies be in fact furnished upon the credit of the owner, although necessary, the admiralty accords no maritime lien for them; and the burden is also rested upon the material man to show that the repairs or supplies furnished were necessary to the continuance of the voyage. There is manifestly no such condition of things in respect of a railway, and the analogy does not obtain.

Upon this subject the supreme court of Alabama in Meyer v. Johnston, 53 Ala. 237, 345, well observes:

"A ship far from home, in distress, and without recourse, must perish, and perhaps her crew with her, if a bottomry bond given then for repairs and supplies shall not have precedence of other liens upon the vessel. But the court does not consider a railroad on terra firma so beyond the reach of help from those who own it or are concerned in it as to justify the adoption in such case of the rule relating to a ship abroad and about to perish."

In Railroad Co. v. Cowdrey, 11 Wall. 459, 482, the supreme court has distinctly held that the principle giving priority to the last creditor for aiding to conserve the thing "has never been introduced into our laws except in maritime cases, which stand on a particular reason."

I cannot yield assent to a doctrine that would practically destroy the immense bonded interest in railway properties, and place mortgage securities at the mercy of reckless and hostile directors.

Mr. Justice Brewer well observes in Kneeland v. Trust Co., supra, that:

"No one is bound to sell to a railroad company or work for it, and whoever has dealings with a company whose property is mortgaged must be assumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subsequently displacing the priority of the mortgage lien."

Nor, if I could here adopt to its fullest extent the principle of the maritime law, would it prove availing to the granting of this petition. The sureties neither stipulated for security nor have they paid the debt. They could acquire no possible right until payment, and if they had paid, under any theory of the maritime law, they

could only be subrogated to the rights of the judgment creditor. As I have stated, the lien of the judgment, so far as it affected the mortgaged property, was subordinate to the lien of the mortgage. There is no showing here that execution ever issued upon the judgment, or was levied upon property not subject to the mortgage, or that any property was released by the giving of the supersedeas bonds.

In a somewhat similar case in the admiralty the surety was adjudged to have no lien. Judge Dyer in that case well observed:

"When libelant incurred the obligation which ultimately he had to pay, he had it in his power to exact security that should amply protect him; and having omitted to do so, in the language of the court in the case cited on the argument, he can only be considered as now possessing the rights which arise against the person for whom he incurred the obligation for having paid money for him which he had voluntarily and without consideration undertaken to pay." The Robertson, 8 Biss. 180, Fed. Cas. No. 11,923.

The decree in this case was on appeal affirmed by Mr. Justice Harlan.

The precise question here involved was passed upon by Mr. Justice Brewer (then circuit judge) in the case of Blair v. Railroad Co., 23 Fed. 523, adversely to the claim of the surety. It is urged, however, that that case is in effect overruled by Trust Co. v. Morrison, 125 U. S. 607, 8 Sup. Ct. 1004. In the latter case the railroad company had mortgaged its lines to the Union Trust Company in 1871. Default in payment of interest occurred in 1873, and continued thereafter. The company was harassed by suits, and a judgment was rendered in November, 1872, in favor of one Holbrook, upon which, in October, 1874, an execution was issued, and the sheriff threatened to levy upon the rolling stock of the company. By the law of the state of Illinois, rolling stock is deemed personal property, and made liable to execution and sale in the same manner as the personal property of individuals. The company, believing the judgment to have been fraudulently obtained, filed a bill in equity to enjoin proceedings for its collection. An injunction was granted therein, upon condition of giving an injunctional bond, with surety, for the payment of the judgment if the injunction should be dissolved. Morrison, at the request of the company, executed such a bond as surety. The bill for the injunction was in February, 1877, dismissed; and in June, 1879, the decree of dismissal was upon appeal affirmed. Holbrook then prosecuted Morrison upon the injunctional bond, and on the 30th day of September, 1880, obtained judgment. In November, 1877, pending the appeal, the trust company filed a bill for the appointment of a receiver and the foreclosure of the mortgage. A receiver was appointed and, finding this appeal with other suits pending against the company, and being met with claims for protection by sureties on appeal bonds, asked the court for its advice and instruction in respect to such appeal bonds and to the protection of the sureties in the event of adverse decision. The court, on consideration, made a decree authorizing the receiver, in his discretion, to prosecute or defend the appeals, and "to protect such sureties as, in his judgment, ought

to be protected in equity and good conscience by means of the protection afforded to the property and assets of the company by means of the giving of such bonds." He was also authorized for the purposes of that decree to use any money coming into his hands as such receiver, over and above the expenses of operation and repairs. It further appeared that the receiver had used funds, under authority of the court, in the purchase of certain real estate which was not covered by the mortgage, and also in the purchase of personal property and rolling stock; and this property was subsequently to the sale, and by order of the court, conveyed by the receiver to the purchaser, although it was not covered by the mortgage. The sale was made "subject to the lien of any and all claims against the said railroad property and assets which are now before this court by intervening petitions, and which shall be upon final determination and adjudication decreed to be paid as liens paramount to the indebtedness secured by said mortgage or trust deed." The intervening petition of the surety was filed prior to that decree. The court in that case emphatically affirmed the general rule which I have sought to state, but found in that case special equities which authorized the allowance of the claim of the surety. There was an actual diversion of the income to the purchase of real and personal property, which, by subsequent order of the court, was conveyed to the purchaser, and which, under the decree of the court, should have been used to protect the surety. The trust company was also bound by the decree which authorized the receiver to protect the surety. That decree seems to have been passed either by the express assent of the trust company or without its objection. The trustee did not seek to obtain possession of the road until more than four years after default in payment of interest, remaining inactive when it should have known that large liabilities were being incurred by the company in the prosecution of its enterprise. The court declare the case to be a special one, and say that, "taking all the circumstances into consideration, we cannot say that equitable relief was unduly extended in allowing the intervener's claim." It would seem that the decision is placed largely upon the fact that the earnings of the road had been appropriated to the purchase of property not covered by the mortgage, and which, by supplemental decree, was conveyed to the purchaser at the sale. The case is peculiar in its facts, and is plainly distinguishable from the case here presented; the court taking occasion to say that it is not its intention to decide anything in the case in conflict with the general doctrine which it had theretofore asserted. The trust company, recognizing the equitable position of a surety without reward, assents to the granting of the petition here. The second mortgage bondholders object. With whatever of favor I may be inclined to consider the case of sureties, and however desirous to relieve them from their liabilities, I cannot see that the court would be justified in imposing the burden of their voluntarily assumed obligations upon the second mortgage bondholders, who were equally innocent, without their consent. The petition will be denied.